IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 8, 2008 Session

## SHUTTLEWORTH, WILLIAMS, HARPER, WARING & DERRICK, PLLC v. GARY K. SMITH, SMITH, SABBATINI & MCLEARY, PLLC

**Appeal from the Chancery Court for Shelby County**
**No. CH-00-0726-1      James F. Butler, Chancellor**

---

**No. W2007-02295-COA-R3-CV - Filed March 5, 2010**

---

This dispute is between an attorney and his former firm. All parties to this suit appeal the trial court's interpretation of their operating agreement about how the fees and expenses generated by the withdrawing member's cases should be apportioned among them. The operating agreement gave the firm discretion to value the services provided by its other members, but the trial court correctly determined that the firm's claimed value was not reasonable. We reverse the trial court's holding with regard to the withdrawing lawyer's interest in a member's share of the expenses he is obligated to pay the firm. The trial court is affirmed on the issue of sanctions and as to its refusal to make an award to nonparties.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Walter Justin Adams, Paul W. Ambrosius, Nashville, Tennessee, for the appellant, Shuttleworth, Williams, Harper, Waring & Derrick, PLLC.

Henry L. Klein, Memphis, Tennessee, for the appellees, Gary K. Smith, Smith, Sabbatini & McLeary, PLLC.

### OPINION

### I. BACKGROUND AND PROCEEDINGS BELOW

This lawsuit arose from the withdrawal of Gary Smith from the Memphis law firm of Shuttleworth, Smith, Williams, Sabbatini & Harper, PLLC ("Firm"). In 1999, Gary Smith,

Robert Sabbatini, Harold McLeary, and William Domico left the Firm to form a new law firm called Smith, Sabbatini & McLeary, PLLC ("SS&M"). The Firm continued to exist after the departure of Mr. Smith and the others, whereupon the Firm then become known as "Shuttleworth, Williams, Harper, Waring & Derrick, PLLC." When Mr. Smith left the Firm, he took a number of cases with him . This appeal concerns how the Firm is to share in fees and repayment of expenses related to those cases as well as other issues relating to Mr. Smith's departure.

The Firm sued Gary Smith individually and his new firm, SS&M, to recover damages under a myriad of different theories, including breach of the Operating Agreement that governed the Firm.[1] Mr. Smith and his new firm, SS&M, counterclaimed alleging, among other things, that the Firm breached the Operating Agreement by failing to pay Mr. Smith amounts due.[2] The attorneys who withdrew from the Firm with Mr. Smith, however, did not join in the counter-complaint individually in an attempt to recover amounts allegedly owed them under the Operating Agreement.

After a bench trial, the trial court found that both Mr. Smith and the Firm had breached the Operating Agreement. The trial court found that Mr. Smith was in breach of the Operating Agreement since he owed the Firm for fees and expenses collected since his departure and awarded the Firm $382,491.93.[3] The court also found the Firm breached the Operating Agreement when it failed to pay Mr. Smith $100,579.62 for his capital account and other amounts. Given the offsetting judgments, the Firm's recovery against Mr. Smith was reduced to $281,912.30, plus interest. The trial court dismissed all other claims raised by the parties.

The trial court made lengthy factual findings, some of which are not relevant to the particular issues raised on appeal. The following undisputed facts, however, provide the context for the dispute between Mr. Smith and the Firm.

In 1980, Gary Smith and Ken Shuttleworth began their law practice together, and over

---

[1]Throughout these proceedings, the Firm was a professional limited liability company governed by the Operating Agreement, and its principals are referred to as members.

[2]Mr. Smith and his new firm alleged in their counter-complaint that the Firm breached the Operating Agreement by failure "to account to Counter-Plaintiffs and, in particular, Gary K. Smith, for all monies due and owing and has failed to pay some, including monthly draws and capital accounts."

[3]The trial court found Mr. Smith had violated the Operating Agreement. However, the trial court found Mr. Smith's new firm, SS&M, was jointly and severally liable "to the extent that the law firm . . . received or retained any of the fees distributed in this case by this order."

the years their practice and firm grew. Initially, the area of practice was insurance defense work. As time went by, however, Mr. Smith began to handle plaintiff personal injury cases. Before the time Mr. Smith and others withdrew from the Firm, the original Firm was experiencing problems arising in part from a defense firm handling plaintiffs' cases. At the time he left the Firm, it was "generally conceded" that Mr. Smith "brought in a large portion" of the Firm's business.

On December 16, 1998, Mr. Smith and Mr. McLeary announced they were withdrawing from the Firm. Ultimately, Mr. Sabbatini and Mr. Domico left the Firm as well to join them. Although the Operating Agreement required 90 days notice prior to withdrawal from the Firm, on February 26, 1999, the Firm waived the notice and asked the withdrawing attorneys to leave, which they did on that date.

The trial court's thorough decision, explained in two letter opinions dated March 6, 2007, and July 25, 2007, decided a variety of issues among the litigants, many of which are not challenged on appeal. The primary issues in this appeal involve the amount of fees, collected after Mr. Smith's withdrawal from the Firm, on cases Mr. Smith took with him. These situations are addressed in the Operating Agreement. Both sides challenge the trial court's interpretation and application of the provisions of the Agreement that address the withdrawal of a member who continues to practice law.

## II. STANDARD OF REVIEW

The trial court's findings of fact are reviewed *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009); *Cross v. City of Memphis*, 20 S.W.3d 642, 643-45 (Tenn. 2000). However, this presumption only applies to findings of fact, not to conclusions of law. As to issues involving questions of law, our standard of review is *de novo* with no presumption of correctness or deference to the legal conclusions made by the lower courts. *Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009); *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008); *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Most of the issues raised by the parties on appeal pertain to the trial court's interpretation of the Operating Agreement. The question of interpretation of a contract is a question of law. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d at 308; *Guiliano v. Cleo, Inc*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Allstate Insurance Company v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and

legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

Our review is governed by well-settled principles. "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Allstate Ins. Co.*, 195 S.W.3d at 611; *Staubach Retail Services - Southeast LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005); *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

All provisions of the contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions. *Teter v. Republic Parking Systems, Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005); *Guiliano*, 995 S.W.3d at 95. The interpretation of an agreement is not dependent on any single provision, but upon the entire body of the contract and the legal effect of it as a whole. *Aetna Cas. & Surety Co. v. Woods*, 565 S.W.2d 861, 864 (Tenn. 1978). The entire contract must be considered in determining the meaning of any or all of its parts. *Id.*

In construing the contract, the trial court is to determine whether the language is ambiguous. *Allstate Ins. Co.*, 195 S.W.3d at 611; *Planters Gin Co.*, 78 S.W.3d at 890. If the language in the contract is clear and unambiguous, then the "literal meaning controls the outcome of the dispute." *Allstate Ins. Co.*, 195 S.W.3d at 611; *City of Cookeville, Tn. v. Cookeville Regional Med. Ctr.*, 126 S.W.3d 897, 903 (Tenn. 2004); *Planters Gin Co.*, 78 S.W.3d at 890. "A contract term is not ambiguous merely because the parties to the contract may interpret the term in different ways." *Staubach*, 160 S.W.3d at 526.

If, however, the language in a contract is susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the contract. *Allstate Ins. Co.*, 195 S.W.3d at 611 (citing *Planters Gin Co.*, 78 S.W.3d at 889-90). Contract language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Allstate Ins. Co.*, 195 S.W.3d at 611 (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

If contractual language is found to be ambiguous, then a court must apply established rules of construction to ascertain the parties' intent. *Allstate Ins. Co.*, 195 S.W.3d at 611-12 *(citing Planters Gin Co.*, 78 S.W.3d at 890). "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact" appropriate for a jury. *Planters Gin Co.*, 78 S.W.3d at 890. In that case, a factfinder may use extrinsic or parol evidence, such as the parties' course of conduct and

statements, to guide the court in construing the contract. *Allstate Ins. Co.*, 195 S.W.3d at 612. If the contract is unambiguous, then the court should not go beyond its four corners to ascertain the parties' intention. *Rogers v. First Tennessee Bank National Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987).

### III. THE AGREEMENT

All parties agree that their disputes over fees and expenses related to clients and cases Mr. Smith took with him are governed by Article XIII of the Firm's Operating Agreement, entitled Special Provisions Regarding Withdrawal of a Member, and, specifically by parts of Section 13.7, which provide:

**13.7 Provisions for Withdrawing Member Who Continues to Practice Law**

(a) In the event a withdrawing Member continues to engage in the practice of law after the date of the withdrawal, and any client of the Company elects to continue with the withdrawing Member, the withdrawing Member shall:

(i) reimburse the Company for any expenses incurred by the Company with respect to the client which have not been previously reimbursed by the client, and

(ii) agree to pay to any other Members who have performed services for the client their proportionate share of the fees received from the client for the value of the other Members' services prior to the withdrawal.

(b) With respect to any clients for whom the Company was performing services on a contingency fee basis, and which elect to continue with the withdrawing Member after the withdrawal, the Company shall determine the value of the services performed by any other Members prior to the withdrawal, which determination shall be binding on the Company and the withdrawing Member, and the withdrawing Member shall pay to the Company the determined amount, if and when any recovery is achieved for the client.

Our construction of the Operating Agreement is governed by the principles outlined earlier. Additionally, Section 17.10 of the Agreement provides:

Every covenant, term and provision of this Operating Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

Additionally, the parties agree that subsections (a)(ii) and (b) of Section 13.7 apply to two different situations, or two types of cases taken by a withdrawing member. They agree that subsection (a)(ii) governs cases where the client pays an hourly fee, while subsection (b) governs cases taken on a contingency fee basis.

## IV. CONTINGENCY FEE CASES

The first disagreement between the parties involves how the Firm should be compensated for contingency fee cases[4] that were (1) opened while Mr. Smith was with the Firm, (2) that he took with him when he left, and (3) which were ultimately successful in that Mr. Smith recovered a fee. The parties agree that, under the Operating Agreement, Mr. Smith owes some amount from these cases. There is also no dispute that subsection (b) of Section 13.7 of the Operating Agreement, quoted above, governs the question of the distribution of fees from such cases.

Section 13.7(b) provides that in contingency fee cases, "if and when" there is a recovery, Mr. Smith is required to pay the Firm "the value of the services performed by any other Members prior to the withdrawal." Predictably, the dispute between the parties centers on the phrase, "value of the services performed by any other Members."

The Firm interprets that phrase, in the context of a contingency fee case, to include more than simply the hours spent by specific other members on a case, but also to include any value contributed by all the other members, such as the Firm's overhead, the Firm's investment in cases, the risk of no recovery at all, and historic value. According to the Firm, since Mr. Smith refused to cooperate in their determination of value, as to each case, then 40% of the contingency fee is a reasonable amount for Mr. Smith to pay the Firm for each case.

On the other hand, Mr. Smith argues that as a matter of contract construction, the

---

[4]Contingency fee cases differ from hourly fee cases since payment of the fee is contingent upon success. Historically, a contingency fee is a percentage of the ultimate recovery. For that reason, due to the fact that there is a risk involved, the attorney's fees in contingency cases are generally greater than hourly fee-based cases.

> It is a universally accepted proposition that contingency fee cases are generally larger than the absolute fee arrangement, as the difference is to compensate the attorney for the risk of non-recovery.

*Jerry T. Beech Concrete Contractor, Inc. v. Larry Powell Builders, Inc.*, M2001-02709-COA-R3-CV, 2003 WL 726955 at *5 (Tenn. Ct. App. March 4, 2003) (no Tenn. R. App. P. 11 application filed).

"value of the services performed by any Member prior to the withdrawal" in Section 13.7(b) necessitates the use of a formula based on the hours actually spent by another member on the particular case. This interpretation of Section 13.7(b) was adopted by the trial court, which specifically held:

> Plaintiff-Firm would urge the Court to include in the phrase 'value of the services performed by any other members prior to withdrawal' the value of the Firm's overhead, [Gary Smith's] draws, Firm investment in case, risks, and historic value. . . The Court rejects this theory. **The value of a case to the Firm is not what is being measured under Section 13.7. What is being measured is the value of the services performed by the other members.** This is a narrow field, and would be measured by the hourly rate of the member and the number of hours logged to the case by the member. (emphasis added)

The Firm argues that the trial court's interpretation of Section 13.7(b) would render any distinctions between subsection (a)(ii) (governing fee-based cases) and subsection (b) (governing contingency fee cases) meaningless. The Firm argues that the subject and language in subsections (a)(ii) and (b) are quite different, so that it logically follows that the parties intended different meanings.

However, the same phrase appears in both subsections and, we believe, should be given meanings that are consistent with each other. Subsection (a)(ii) requires payment to other Firm members "who have performed **services** for the client" their **proportionate share** of fees "for the value of the other Members' **services**." Thus, payment is for services for a particular client in a particular matter, and those services are valued at the member's hourly rate.

The trial court found, and all parties agree, that subsection (a) requires use of the hourly rate formula to compensate the other members when a withdrawing member takes a fee-based case with him. Payment to the Firm under subsection (b) is also based on "the value of the **services** provided by any other Members." We are not inclined to give that term different definitions in the two subsections.

Accordingly, the terms "services," "members' services," and "services performed by members" must mean the same thing in both subsections of section 13.7 of the Agreement. That meaning would not, in our opinion, include things like the Firm's overhead, the Firm's risk, etc, because those are not **members' services**, as intended in the agreement as a whole, and were not **performed** by members. Such expenses are Firm expenses, and the Firm

provided them.[5]  In other words, we agree with the trial court's statement that "[t]he value of a case to the Firm is not what is being measured under Section 13.7.  What is being measured is the value of the services performed by the other members."  We agree that Section 13.7 requires a withdrawing member to repay the Firm for the value of other members' services in a particular case.  While nothing in the language of the Operating Agreement would require the Firm to use the same hourly rate in fee-based and contingency fee cases, any rate used should be a reasonable value of the services.

The critical provision of section 13.7(b), however, that guides our interpretation of the Agreement and its application to the facts before us states that the Firm "shall determine the value of the services performed by any other Members prior to the withdrawal, which determination shall be binding on the [Firm] and the withdrawing Member. . . ."  Clearly, the plain language of that provision gives the Firm final authority to determine the value of the services, and Mr. Smith agreed to be bound by the firm's valuation.

However, the Firm does not have unrestricted discretion in determining the amount Mr. Smith owes.  Its authority to set a value is limited to the value of **services performed by any other members** in a particular case prior to Mr. Smith's withdrawal, as we have described the meaning of those terms.  Accordingly, valuation should be based upon a reasonable value of the services any particular member performed with regard to a particular case.  That means that the Firm must demonstrate that it arrived at an amount that reasonably reflects the value of the services provided by any particular member.

While under the Operating Agreement, determining the "value of the services performed by any other Members" is a task clearly and unequivocally assigned to the Firm, the Firm acknowledges that its discretion in making this valuation determination is not boundless and is also limited by the implied terms of good faith and fair dealing.  *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Barnes & Robinson Co., Inc. v. OneSource Facility Service, Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006).  In other words, the Firm must be reasonable.

Thus, the Firm was authorized to determine the value of the members' services performed in the relevant cases, and the court's task was to determine whether that valuation was reasonable.  The Firm's position was that it was reasonable to use the same percentages that would have applied if Mr. Smith had stayed with the Firm - *i.e.*, under Section 8.4, the Firm would recover 40% of the contingency fees after certain deductions.  The Firm based this position on its assertion that it asked Mr. Smith to provide information on the extent of

_____

[5]Mr. Smith, a former chair of the Firm's management committee, testified that the defense work and fee-based cases covered the Firm's overhead, so the Firm's share of any recovery in contingent fee cases was profit, which would be distributed to members.

his work on the contingency fee cases after he withdrew so the Firm could determine the value of the other members' services, but that he refused to provide this information.[6] In the absence of that information, the Firm argues, it was reasonable to use 40% because the members had agreed in the Operating Agreement that a 60/40 split was fair or reasonable.

Indeed, Section 8.4 of the Agreement, which applies if a member does not withdraw and his contingency case is successful, provides that the Firm gets 40% of the contingency fee after certain expenses are paid. Clearly, all parties agreed that the value of member services on contingency fee cases that stayed with the Firm until completion is 40%. It should be noted that, in the situation covered by section 8.4, the member whose contingency fee case results in a fee shares in the contingency fee twice: first, he receives 60% of the fee off the top after expenses, and second, he gets a member's share of the fee paid to the Firm as a profit sharing member.

The Firm's reasoning overlooks an important distinction between a fee distribution on a case where all the work was performed while the attorney was a member of the firm and distribution of a fee for a case where most of the work, or a substantial part, was done after the attorney withdrew from the Firm. A distribution that may be reasonable in the first situation may be unreasonable in the other. For example, if 95% of the work done on a case was performed after the withdrawal, it would not generally be reasonable for the Firm to receive 40% of a fee resulting from that work.

Further, just as the Firm argues that subsection (b) cannot be automatically interpreted to produce the same valuation as subsection (a)(ii), we think that subsection (b) (governing withdrawing members) cannot be interpreted to automatically value amounts due the Firm in contingency cases the same way as section 8.4 (governing fee distribution where there is no withdrawal from the Firm). In other words, courts must seek to give effect to all sections of the Agreement without rendering any specific provision meaningless. Contracts must be construed to the extent reasonable to "give effect to every term." *Buettner v. Buettner*, 183 S.W.3d 354, 358 (Tenn. Ct. App. 2005). That means that the Agreement must be interpreted in such a way as to give Section 13.7(b) a meaning that is different from the other provisions on calculating fee distributions. The Firm's valuation, based on the methodology of section 8.4, does not meet this requirement.

While the Firm does not argue that Section 8.4 applies directly, it argues that the percentage division established in that Section established a reasonable division because the members agreed to it. We cannot conclude that an agreement regarding distribution of fees where a member remains with the Firm can be construed as reflecting an agreement when

---

[6]The Firm possessed records of work done on all the relevant cases before Mr. Smith's withdrawal.

another set of facts exists. Instead, the members reached a different agreement applicable to the situation where a member withdraws, Section 13.7(b).

As discussed above, it was up to the Firm to establish a reasonable valuation of the services performed on each case by members of the Firm other than Mr. Smith. The issue for the trial court, then, was whether the Firm's valuation is reasonable. In performing its task to determine reasonableness, the trial court carefully and methodically looked at the facts surrounding twenty-five cases and set out its findings as to each case. In each case, where relevant, the trial court ordered the repayment of expenses and associate and paralegal time (as expenses), and ordered prejudgment interest on any amounts due the firm.

As to the value of members' services, the court found that in six (6) of the cases, no member of the firm had performed any work on the case. In one (1) case, there was no fee generated. In four (4) cases, the trial court awarded members services in the amounts reflected in the Firm's records (which include a column for partner fees and partner hours worked). For twelve (12) cases, the trial court did not have some information and, in many, it was unclear whether the client had recovered damages and/or whether any fees had ever been collected by Mr. Smith. In those cases, the trial court ordered that if there were a recovery of fees by Mr. Smith, then those fees would be distributed by Mr. Smith in the same fashion as the court had ordered in the Haith case. In that case, the court had ordered that if any fee had been collected, the Firm's expenses were to be paid first, then paralegal and associate time as reflected on the Firm's records, and then to any member who was reflected in the Firm's records as having worked on the case. Mr. Smith was to keep any balance.

We have carefully reviewed the testimony in this case, and we hold that the evidence does not preponderate against the trial court's determination of reasonable value due the Firm. The evidence included a list or schedule, generated by the Firm, of some of the cases that Mr. Smith had taken with him. That list included columns for hours worked by partners (members), and a dollar amount for fees for that work.[7] The evidence, although not entirely clear, indicated that the Firm determined the amount to be used as the hourly rate for each member. One member of the Firm who had management responsibilities stated that the rate was an arbitrary number.

We agree with Mr. Smith's position that the determination of the value of other members' services had already been made "because the value of the services performed by any other member was already attributed to the file while the work was in progress." Mr. Smith maintained that other members recorded their time and the services were valued on the front end "because people were to be paid accordingly." The Firm failed either to show

---

[7]Similarly, there were columns for Paralegal/Clerk Fees and Hours and columns for Associate Fees and Hours.

that the fees reflected in Firm records were not reasonable or to support the reasonableness of any other rate, which, as discussed above, could be greater than the attorney's fee-based case rate.

Examples of a few specific cases provides some context for the trial court's determinations. The Hunter case was resolved six years after Mr. Smith left the firm. The Firm claimed 40% of the entire fee (after expenses and employee time recouped), but had no explanation of why that number would be reasonable. The Firm representative stated that since the Firm had no information upon which it could make a **fair** determination, it chose the "arbitrary" figure of 40%. In another case, the Firm was requesting 100% of the fee, based apparently on a theory of disgorgement. Other cases involved no member time while Mr. Smith was with the Firm; some did not result in a fee; and others, like Hunter, were worked on primarily after Mr. Smith's withdrawal.

Because the Firm chose the amount to enter into its computer program for the value of each member's services in a case and recorded each member's time on cases as generating a specific fee, we conclude, as did the trial court, that the Firm's records provided the reasonable value of the other members' services in each contingency fee case that Mr. Smith took with him.

### V. MR. SMITH'S SHARE OF FIRM PROFITS

The Firm challenges the trial court's holding with regard to Mr. Smith's interest in funds he owes to the Firm for cases he took with him. This issue concerns whether Mr. Smith, as a former Firm member, can share in amounts he was ordered to pay under the Operating Agreement. In other words, is Mr. Smith entitled to his member's portion (based on ownership percentages) of the expenses and fees for services performed by other members on the contingency fee cases he took with him? Specifically, the trial court made the following finding of fact:

> To the extent that the Firm recovers funds in this case which would be distributable to the members of the Firm under the Operation Agreement, the Defendant-Smith and/or McLeary will recover their share of those expenses according to the percentage of distributable cash attributable to them under the Operating Agreement as part of their distribution of their respective capital accounts.

The court then found that the proof showed that at the time of the withdrawals, Mr. Smith had a 19.57% ownership interest in the Firm. Based on these findings, the trial court ordered that Mr. Smith recover his capital account as of December 31, 1998, as well as "any amounts attributable to the accounts for expenses and/or fees paid to the Firm under this

judgment which would increase the capital account of the members under the operating agreement." Thus, the proceeds at issue are the amounts Mr. Smith owes the Firm under Section 13.7(b) discussed above.

The trial court did not award a specific amount, and it appears that the amount due would depend on the circumstances of each case as well as whether, and to what extent, any portion of the amounts paid by Mr. Smith was actually profit that would have been distributed to members.

Mr. Smith argues that under Section 8 of the Operating Agreement, if a member has not withdrawn and if his contingency fee case is successful, then he shares in the contingency fee twice, first, he receives 60% of the fee off the top after expenses, and second, he gets a member's share of the fee paid to the Firm as a profit sharing member. This position assumes, of course, that all net fees on contingency cases constitute profit. He also relies on Sections 11.1(d) and 13.7 and argues that all the provisions, taken together, require that he receive a pro rata share of fees and expenses coming into the firm.

However, Mr. Smith testified that the regular practice under the Operating Agreement for the distribution of contingency fees, where the responsible attorney remained with the firm, was to first repay expenses and associate time. Then any member who had worked and recorded time on a contingency fee case would receive 40% of his time spent on the case. That's why, according to Mr. Smith, members recorded time spent on contingency fee cases. Then, the remainder after those payments, or the net of the fee, would be divided between the responsible attorney (60%) and the firm (40%).

Earlier in this opinion, we have affirmed the trial court's decision regarding Mr. Smith's obligation to the Firm. He was ordered to pay the expenses, including paralegal and associate time, and the value of the services of any member who worked on a case. He was not ordered to pay 40% of the net fee to the Firm. Consequently, we find no factual basis for allowing him to deduct his membership portion of the Firm's share of the fees. The Firm was not awarded that share, so there is nothing that would have been distributed to him as a member. Any portion of that 40% that, after payment of the Firm's overhead and other expenses, constituted profit would be distributed to members according to their ownership percentages.

The trial court is, consequently, reversed on this issue.[8]

---

[8]In this appeal, the Firm also asserts that the trial court mistakenly found that Mr. Smith's percentage ownership in the Firm was 19.75% and that it was actually 17.57%. Because the ownership percentage is only relevant to the deductions awarded Mr. Smith by the trial court as discussed in part IV of this opinion,
(continued...)

## VI. PAYMENT OF EXPENSES IN FEE-BASED CASES

This issue pertains to Mr. Smith's obligation to pay the Firm for expenses for fee-based *cases* under Section 13.7(a) of the Operating Agreement. The trial court found that Mr. Smith was not obligated to reimburse the Firm's expenses[9] under Section 13.7(a)(i) until Mr. Smith had received payment from the client. According to the Firm, the Operating Agreement required payment immediately upon withdrawal. This issue is pertinent since prejudgment interest begins to run on the date the expense payment is due.

Section 13.7(a) of the Operating Agreement provides:

(a) In the event a withdrawing Member continues to engage in the practice of law after the date of the withdrawal, and any client of the Company elects to continue with the withdrawing Member, the withdrawing Member shall:

(i) reimburse the Company for any expenses incurred by the Company with respect to the client which have not been previously reimbursed by the client,

The provision does not explicitly address the timing of these payments. Based on the evidence presented regarding fee-based cases, the trial court held that these expense payments were due to the Firm when Mr. Smith collected them from the client. Having reviewed the record, we cannot conclude that the trial court erred.

## VII. MR. SMITH'S ISSUES ON APPEAL

Mr. Smith's issues on appeal pertain to three areas: sanctions, award to withdrawing members of the Firm who were not parties, and whether the Firm's breach of the Operating Agreement bars the Firm's recovery.[10]

First, Mr. Smith argues the trial court erred when it declined to award sanctions against the Firm and its attorneys. All parties agree that the standard of review of a trial

---

[8](...continued)
and because we have reversed the trial court as to these deductions, this issue is no longer relevant.

[9]The trial court found that paralegal and associate time spent on cases Mr. Smith took with him were to be assessed as expenses. This finding was not appealed.

[10]Because both Mr. Smith and the Firm failed to comply with the Operating Agreement, and because the primary issues herein involve interpretation and application of that Agreement, we conclude, as did the trial court, that the Firm is not precluded from recovery herein.

court's decision regarding sanctions is abuse of discretion. *Hooker v. Sundquist*, 107 S.W.3d 532, 535 (Tenn. Ct. App. 2002). An abuse of discretion occurs when the decision of the lower court has no basis in law or fact and is consequently arbitrary, illogical or unconscionable. *Id.*

Mr. Smith based his motion for Tenn. R. Civ. P. 11 sanctions on allegations about his conduct in dealing with the Firm in the complaint, which the trial court ultimately found were not proved by a preponderance of the evidence. We agree with Mr. Smith that these types of allegations are "serious business" that impugn an attorney's integrity and reputation. There is evidence in the record, including from the Firm's representative, that Mr. Smith enjoyed an excellent professional reputation.

Having reviewed the record, we cannot conclude that the trial court's decision was arbitrary, illogical, unconscionable, or otherwise an abuse of discretion, so the denial of Rule 11 sanctions is affirmed.

In its original letter opinion of March 6, 2007, the trial court found that Mr. McLeary, Mr. Sabbatini, and Mr. Domico, former Firm members who withdrew with Mr. Smith, were entitled to recover amounts due to them in their capital accounts. The trial court then modified its ruling on this issue in its second letter opinion of July 25, 2007 finding that since these individuals were not parties to the lawsuit, then the court lacked jurisdiction and the award was not appropriate. Thereafter, Mr. Smith then moved to add these other withdrawing members as parties, and the trial court denied the motion.[11]

Mr. Smith rests his argument on Tenn. R. Civ. P. 17.01, which provides in pertinent part,

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification or commencement by, or joinder or substitution of, the real party in interest . . .

Mr. Smith argues that since the Firm did not object to this award until after it was made, the objection was waived. We do not find, however, that it is incumbent upon a party to anticipate that the court may include in its award individuals who are not parties to the suit.

---

[11]Apparently, it was acknowledged that these individuals were not parties to the lawsuit since Mr. Smith moved under Tenn. R. Civ. P. 17.01 to add them as real parties in interest and moved to Alter or Amend the Judgment to include their recovery.

Significantly, during the course of the trial, after objection to evidence regarding the account of one of the other withdrawing members, there was a discussion among counsel and the court about the other withdrawing members. In that discussion, the trial court stated that those members had not asserted any personal claims, and that asserting the right to member's capital account would be a personal claim. It was clearly acknowledged that the other withdrawing members were not parties to this lawsuit. The firm that Mr. Smith and the other withdrawing members formed, SS&M, was a party, not because it was involved in the Operating Agreement, but because it may have held the funds at issue. Consequently, we cannot conclude that the Firm waived an objection to adding the withdrawing members as parties to this lawsuit.

Additionally, we do not agree that the other withdrawing members were indeed real parties in interest. The Firm's claims were against Mr. Smith and the newly formed law firm. His counterclaim was against the Firm. The court was able to try and decide the claims between these parties, separate and apart from any interest or claim the other withdrawing members may have had. Simply because the trial court made a ruling that could benefit individuals who were not made parties does not mean that they were real parties in interest.

We would be remiss if we failed to observe that this litigation proceeded for years and involved lawyers and law firms. The unnamed individuals were lawyers themselves in practice with Mr. Smith and were members of the named defendant law firm. They were former members of the Firm and subject to the Operating Agreement just as Mr. Smith was. If they intended to seek recovery from the Firm, every avenue was open to them to make such a claim. Either through indifference, lack of interest in any recovery potential, efforts to stay out of the fray, or any other number of reasons, these three former members made no claim against the Firm.[12]

We can find no reversible error in the trial court's decision not to allow the addition of other parties to the lawsuit after judgment was rendered.

## VIII. CONCLUSION

The findings of the trial court pertaining to the amounts Mr. Smith owes the Firm under Section 13.7(b) for contingency fee cases he took with him are affirmed. The judgment of the trial court that Mr. Smith is entitled to recover his membership share of any amounts recovered by the Firm under Section 13.7(b) is reversed. In all other respects, the

---

[12]Mr. Smith argues that this ruling constitutes a windfall to the Firm. The trial court, however, did not rule that the Firm could retain the capital account of Mr. McLeary, Mr. Sabbatini or Mr. Domico, only that the claim had not been made in this lawsuit.

trial court is affirmed.

Costs of this appeal are taxed equally between the Appellant, Shuttleworth, Williams, Harper, Waring & Derrick, PLLC, and the Appellees, Gary K. Smith, Smith, Sabbatini & McLeary, PLLC, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, P.J., M.S.